IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| **GREATER NEW YORK MUTUAL INSURANCE COMPANY**, *et al.*, | * * * * | |
| Plaintiffs, | * * | |
| v. | * * * | Civil Case No. SAG 20-1251 <br> Civil Case No. SAG 20-2519 |
| **C&S MECHANICAL, LLC**, | * * | |
| Defendant/Third-Party Plaintiff. | * * | |

\* \* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM OPINION

In these consolidated actions, Plaintiffs Greater New York Mutual Insurance Company ("GNY"), and Federal Insurance Company, Chubb National Insurance Company, and Great Northern Insurance Company (collectively "Resident Insurers"), seek reimbursement in subrogation for claims arising from alleged water damage sustained at the Warrington condominium building. ECF 24; ECF 1, No. 20-2519. Defendant C&S Mechanical, LLC ("C&S") filed Second Amended Third-Party Complaints ("SATPC") in both actions, naming several Third-Party Defendants and seeking contribution and indemnification for any liability it may incur in the underlying lawsuits. *See* ECF 34; ECF 22, No. 20-2519. Two of those Third-Party Defendants, Wolverine Brass Inc. ("Wolverine") and the Council of Unit Owners of the Warrington ("the Council") have filed Motions for Summary Judgment. ECF 66, ECF 67. This Court has reviewed those motions and the oppositions and responses filed thereto. ECF 68, ECF 70, ECF 72. No hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2021). For the reasons that follow, both motions will be granted.

1

I.      **FACTUAL AND PROCEDURAL BACKGROUND**

The facts described herein are viewed in the light most favorable to C&S as the non-moving party.

The Council governs the affairs of the Warrington, a thirteen floor residential condominium building located at 3908 North Charles Street, Baltimore, Maryland. ECF 24 ¶ 9. In 2017, Larry Jennings, the owner and resident of Unit 1301 in the Warrington ("the Unit"), hired Miller Contracting Group, LLC, ("Miller") to perform renovations in his residence. ECF 24 ¶ 9. Miller, in turn, retained C&S as a subcontractor for the required plumbing and mechanical work in the Unit. *Id.* ¶ 10.

In October, 2017, Jennings entered an agreement with the Council to obtain approvals for his planned renovations. The letter agreement stated that "[Jennings] recognize[s] your planned construction will impact the Warrington and its other residents, and you and The Miller Contracting Group agree: 1) to follow the guidelines in Section VIII of the Warrington's Rules and Regulations, 2) to keep the Warrington code compliant during the construction process, and 3) to limit and mitigate any negative impact of your construction project, to the extent reasonably possible." ECF 67-2. The agreement further stated that Jennings agreed to "[c]over the costs of any damage resulting from any leaks or other problems arising from construction," and to "[r]eimburse The Warrington for any additional costs it incurs that is related to construction in Unit 1301 . . .". *Id.* The agreement was signed by Jennings and by Michael Miller on behalf of Miller. *Id*.

As relevant here, Miller and C&S altered the conditions in the Unit during the renovations in two notable ways. First, in August, 2018, C&S "modified the cold water supply line in Unit 1301's mechanical closet so that other subcontractors would have access to water during the

performance of their respective duties." ECF 66-3 ¶ 18; *see also* ECF 24 ¶ 12. When making this modification, C&S did not touch or otherwise alter a Wolverine-manufactured ball valve installed on the Unit's cold water supply line. ECF 68-1 at 4. Second, Miller removed the windows from the Unit, including those closest to the mechanical closet housing the cold-water supply line, so that they could be replaced. ECF 66-5 ¶ 12. According to C&S, the windows may have been removed from the Unit for over a month, ECF 70-1 at 7, during which time they were covered with plastic, ECF 70-2 at 17.

In late January, 2019, Baltimore, Maryland experienced sustained freezing temperatures. On January 21, 2019, the average temperature in Baltimore was approximately 16 degrees Fahrenheit. ECF 66-3 ¶ 18. On January 22, 2019, the average temperature was approximately 22 degrees Fahrenheit. *Id.* During this period, no heat was provided to the Unit, including the mechanical closet. *See* ECF 24 ¶ 18. On January 22, 2019, the Unit's cold-water supply line froze, the pressure of which caused the upper and lower segments of the Wolverine-manufactured ball valve to split and begin leaking. ECF 24 ¶ 13; ECF 68-1 at 4-5 ("thereby causing the pipes to freeze . . . The frozen water conditions on January 22, 2019 inside the plumbing lines caused the separation of the upper and lower portions of the Wolverine ball valve . . . The cause of the separation of the Wolverine ball valve was due to the freezing temperatures inside unit 1301 on January 22, 2019.").

Terrence Minor, the Warrington's superintendent, received a phone call from his supervisor notifying him of the leak. ECF 70-2 at 19. Minor, who was on his lunch break, returned to the Warrington, entered the Unit, and observed "water gushing out of the pipe [] in the utility room," which had already pooled in several inches on the floor. *Id.* at 20. After realizing that the pipe's ball valve had separated—and therefore could not be used to shut off the water—Minor left

the Unit and ran down the stairs to the 12th floor, where he was aware of another water valve that could be used to stop the leak. *Id.* Minor's attempts to access the valve on that floor, however, were frustrated by the heavy flow of water streaming through the ceiling from the floor above. *Id.* at 21 ("I . . . try to head to the area where that valve was located. It was like traveling through a waterfall. It was just a tremendous amount of water just flowing down from the ceiling, down the walls, on my knees, and just like going through like a tight tunnel, tight cave to try to gain access to where that valve was located."). Minor received a call on his radio informing him that personnel from the Baltimore City Fire Department had arrived and left to meet them. *Id.* at 21-22; *see also* 67-3 at 5. Minor subsequently returned to the 12th floor with a firefighter, who confirmed that they would be unable to safely access the valve on that floor. *Id.* at 22. Minor and the firefighter then traveled to the lower level of the Warrington to reach its main water supply valve. *Id.* Upon reaching the main water valve, however, neither Minor nor the firefighter could turn the wheel on the valve to shut off the water. Indeed, Minor and the firefighter used two pipe wrenches to attempt to turn the main water valve's wheel, to no avail. *Id.* at 23 ("The wheel was pretty hard to turn, it was tight. I tried to turn it and the fire marshal tried to turn it . . . I ran to my shop to grab a pipe wrench. We put that on there. The wheel still wouldn't turn . . . one of the firemen came back in with a bigger pipe wrench and tried to turn the wheel and it still wouldn't turn."). While still attempting to turn off the main water valve, Minor received word that Miller had somehow succeeded in stopping the leak. *Id.* The duration of time during which the leak persisted is not clear. In sum, the leak and subsequent flow of water (hereinafter referred to as "Water Intrusion Incident") resulted in significant damage both to the Warrington itself and to several condominium units on the 10th, 11th, and 12th floors (hereinafter referred to as "Affected Condos"). *See* ECF 1 ¶¶ 4-12, No. 20-2519.

In May, 2020, GNY as subrogee to the Council, which it insures, sued Miller and C&S for damages arising from their alleged negligence ("GNY Action"). ECF 1; ECF 24. Likewise, in August, 2020, Resident Insurers sued C&S for reimbursement of claims paid for damages to the Affected Condos ("Resident Insurers' Action"). ECF 1, No. 20-2519. C&S subsequently filed an SATPC seeking indemnification and contribution from Wolverine in the GNY Action, ECF 34; and an SATPC seeking indemnification and contribution from Wolverine and the Council in the Resident Insurers' Action, ECF 22, No. 20-2519.[1] The two actions were consolidated in January, 2021. ECF 42. Wolverine and the Council now seek summary judgment as to the respective claims against them in the consolidated actions.

## II.  LEGAL STANDARDS

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party bears the burden of showing that there is no genuine dispute of material facts. *See Casey v. Geek Squad*, 823 F. Supp. 2d 334, 348 (D. Md. 2011) (citing *Pulliam Inv. Co. v. Cameo Props.*, 810 F.2d 1282, 1286 (4th Cir. 1987)). If the moving party establishes that there is no evidence to support the non-moving party's case, the burden then shifts to the non-moving party to proffer specific facts to show a genuine issue exists for trial. *Id.* The non-moving party must provide enough admissible evidence to "carry the burden of proof in [its] claim at trial." *Id.* at 349 (quoting *Mitchell v. Data Gen. Corp.*, 12 F.3d 1310, 1315-16 (4th Cir. 1993)). The mere existence of a "scintilla of evidence" in support of the non-moving party's position will be insufficient; there must be evidence on which

---

[1] C&S named additional Third-Party Defendants in both actions, which are not relevant to resolution of the instant Motions.

the jury could reasonably find in its favor. *Id.* at 348 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986)). Moreover, a genuine issue of material fact cannot rest on "mere speculation, or building one inference upon another." *Id.* at 349 (quoting *Miskin v. Baxter Healthcare Corp.*, 107 F. Supp. 2d 669, 671 (D. Md. 1999)).

Additionally, summary judgment shall be warranted if the non-moving party fails to provide evidence that establishes an essential element of the case. *Id.* at 352. The non-moving party "must produce competent evidence on each element of [its] claim." *Id.* at 348-49 (quoting *Miskin*, 107 F. Supp. 2d at 671). If the non-moving party fails to do so, "there can be no genuine issue as to any material fact," because the failure to prove an essential element of the case "necessarily renders all other facts immaterial." *Id.* at 352 (quoting *Coleman v. United States*, 369 F. App'x 459, 461 (4th Cir. 2010) (unpublished)). In ruling on a motion for summary judgment, a court must view all of the facts, including reasonable inferences to be drawn from them, "in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)).

### III. DISCUSSION

#### A. Contribution

C&S asserts claims against both Wolverine and the Council for contribution. Contribution is an equitable doctrine that provides for "the distribution of loss among culpable parties in accordance with their proportionate shares. It is defined as 'a payment made by each, or by any, or several having a common interest of liability of his share in the loss suffered, or in the money necessarily paid by one of the parties in behalf of the others.'" *Armellini v. Levin*, No. 19-cv-794, 2020 WL 104899, at *18 (D. Md. Jan. 9, 2020) (quoting *Hartford Acc. & Indem. Co. v. Scarlett*

*Harbor Assoc. Ltd. P'ship*, 109 Md. App. 217, 280, 674 A.2d 106, 137 (1996)).  Under Maryland's Uniform Contribution Among Tort-Feasors Act ("UCATA"), a defendant may seek contribution from a joint tortfeasor where "two or more persons [are] jointly or severally liable in tort for the same injury to a person or property."  Md. Code (2013 Repl. Vol.), Cts. & Jud. Proceedings Art., § 3-1402(c); *see also Armellini*, 2020 WL 104899, at *18 ("[c]ommon liability exists when two or more actors are liable to an injured party for the same damages, even though their liability may rest on different grounds." (quoting *Parler & Wobber v. Miles & Stockbridge*, 359 Md. 671, 687, 756 A.2d 526, 534 (2000))).

  **i. Wolverine**

The SATPC in both actions assert contribution claims against Wolverine on the basis of its allegedly defective ball valve design.  Maryland law recognizes multiple theories of recovery for design defect cases, including strict liability and negligence.  *Murphy ex rel. Murphy v. Playtex Fam. Prod. Corp.*, 176 F. Supp. 2d 473, 484 (D. Md. 2001).  Under both strict liability and negligence theories, however, a plaintiff must show "three product litigation basics": (1) "defect;" (2) "attribution of defect to the seller;" and (3) "a causal relationship between the defect and the injury."  *Parker v. Allentown, Inc.*, 891 F. Supp. 2d 773, 780 (D. Md. 2012) (quoting *Laing v. Volkswagen of Am., Inc.*, 180 Md. App. 136, 159 (2008)); *Murphy*, 176 F. Supp. 2d at 484-95 (analyzing the particular elements of each theory).  Wolverine contends that C&S's evidentiary showing regarding defect and causation are not sufficient to survive summary judgment.  As to causation, this Court agrees.[2]

---

[2] Having concluded that C&S fails its burden on the element of causation, this Court finds it unnecessary to resolve Wolverine's argument regarding the existence of a defect.

To establish the requisite proximate causation, "a plaintiff must demonstrate that a defendant's acts or omissions are both a cause-in-fact of the plaintiff's injuries and a legal cause of those injuries." *Brodsky v. KaVo Dental Techs., LLC*, 2017 WL 6388611, at *1 (D. Md. Dec. 14, 2017) (citing *Chang-Williams v. United States*, 965 F. Supp. 2d 673, 692 (D. Md. 2013)). A cognizable injury may have more than one proximate cause, and a plaintiff need not establish that the defendant was the sole cause of the injury. *Young v. United States*, 667 F. Supp. 2d 554, 561 (D. Md. 2009). Rather, proximate cause is satisfied if it is more likely than not that the defendant's conduct was a substantial factor in producing the plaintiff's injuries, and the ensuing harm was reasonably foreseeable. *Brodsky*, 2017 WL 6388611, at *2 (quoting *Chang-Williams*, 965 F. Supp. 2d at 693). "Although causation is generally a factual question for the jury, it becomes a question of law in cases where reasoning minds cannot differ." *Id.* (quoting *Doe v. Board of Educ. Of Prince George's Cty.*, 982 F. Supp. 2d 641, 662 (D. Md. 2013)).

C&S does not dispute that the separation of the Wolverine ball valve and the ensuing Water Intrusion Incident were proximately caused by the Unit's prolonged exposure to the elements during a period of extreme cold. *See* ECF 34 ¶ 17; *see also* ECF 68-1 at 2 ("The separation of the Wolverine ball valve was due to sustained temperatures below thirty-two (32) degrees Fahrenheit in December 2018 and January 2019."). C&S maintains, however, that the Wolverine ball valve's allegedly defective design was also a substantial factor in producing Plaintiffs' ultimate injuries. Specifically, C&S argues that: (1) an alternative design could have withstood a greater amount of force before separating; and (2) upon separation, an alternative design would have limited the flow of water into the Unit. ECF 68-2 at 12-13. C&S's primary evidence in support of its causation theory is the opinion of its proposed expert witness, Dr. Brian Bramel. Wolverine contends that

C&S's evidence fails because Dr. Bramel's opinion on causation is unreliable and speculative. Wolverine is correct.

The Federal Rules of Evidence "permit[] an expert to testify where the expert's 'scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue,' so long as the expert's opinion is 'based on sufficient facts or data,' 'is the product of reliable principles and methods,' and the expert 'has reliably applied the principles and methods to the facts of the case.'" *In re Lipitor (Atorvastatin Calcium) Mktg.*, 892 F.3d 624, 631 (4th Cir. 2018) ) (citing Fed. R. Evid. 702). "In assessing the admissibility of expert testimony, a district court assumes a 'gatekeeping role' to ensure that the 'testimony both rests on a reliable foundation and is relevant to the task at hand.'" *Id.* (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993)). The reliability of specialized knowledge may be measured by a variety of factors, including "testing, peer review, error rates, and 'acceptability' in the relevant scientific community." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999); *see also Daubert*, 509 U.S. at 592-94. At bottom, however, "the court's evaluation is always a flexible one, and the court's conclusions necessarily amount to an exercise of broad discretion guided by the overarching criteria of relevance and reliability." *Oglesby v. Gen. Motors Corp.*, 190 F.3d 244, 250 (4th Cir. 1999).

Applying these principles to this case, this Court concludes that Dr. Bramel's opinion on causation does not rest on a reliable foundation and must be excluded. Dr. Bramel's expert report opines that "a product defect within the [W]olverine ball valve [] allowed the valve to fail earlier and caused the water to run more freely once the failure occurred." ECF 66-7 at 4. Dr. Bramel does not estimate how much longer an alternative design could have withstood the freezing conditions, or whether his proffered design could have remained intact until conditions in the Unit

had improved. Crucially, the expert reports contain no indication of what, if any, principles or methodology informed Dr. Bramel's opinion that the Wolverine ball valve failed prematurely and allowed an excessive flow of water. It does not appear that Dr. Bramel conducted any tests on the Wolverine ball valve, or that he inspected or evaluated an alternative design to determine the amounts of pressure that each respective design could endure. During his deposition, Dr. Bramel conceded that he made no attempt to calculate: (1) the maximum pressure that the allegedly defective Wolverine ball valve could have withstood before separation; (2) the pressure actually exerted upon the Wolverine ball valve on the day of the Water Intrusion Incident; or (3) the pressure that would be required to cause separation in his alternative design. ECF 68-2 at 73-74. Without these datapoints, Dr. Bramel could not, and did not, demonstrate any factual underpinning for his assertion that an alternative design could have longer withstood the conditions in the Unit. Moreover, even assuming that the Wolverine ball valve separated earlier than an alternative design, Dr. Bramel failed to demonstrate the significance of such a differential. Indeed, there are no facts suggesting that damages to the Warrington would have been prevented or mitigated if the ball valve on the Unit's cold water supply line had separated minutes, hours, or days later. In short, Dr. Bramel's bare assertion that an alternative design could have handled "more" pressure before separation amounts to little more than immaterial speculation. *See id.* at 74. Similarly, Dr. Bramel's opinion that an alternative design, even once separated, would have allowed less water to flow into the Unit is unsupported by objective methodology, examination, testing, or calculations. Simply put, Dr. Bramel's opinion is too speculative to form a reliable basis for C&S's theory of causation.

In opposition, C&S insists that Dr. Bramel is equipped with specialized education and professional experience to credibly opine on the alleged design flaw of the Wolverine ball valve.

*See* ECF 68-1 at 7-8.  C&S further asserts that Dr. Bramel's opinion regarding the alleged defect is based on sufficient facts and data—including his physical inspection, and review of measurements and microscopic images of the Wolverine ball valve—and is informed by broadly accepted safety standards.  ECF 68-1 at 10; *see also* ECF 68-2 at 59.  C&S's arguments to this effect are largely beside the point.  Dr. Bramel's professional background and opinions on ball valve design are immaterial to the question of whether his theory of causation is based on sufficient facts and derived from the application of reliable principles and methods.  Dr. Bramel may well be qualified to opine on ball valve design, but it is not enough for C&S to create a genuine dispute that the Wolverine ball valve was defectively designed.  C&S must also adduce evidence that the Water Intrusion Incident was the result of the alleged defect.  Without having conducted any tests, calculations, measurements, or otherwise demonstrated any objective methodology upon which his opinions are based, Dr. Bramel's theory regarding causation is largely hypothetical and is inadmissible.

Having excluded Dr. Bramel's opinion on causation, C&S is left with no evidence as to its core allegation that Wolverine's alleged design defect proximately caused the Water Intrusion Incident.  *Johnson v. Ford Motor Co.*, 2018 WL 1512377, at *7 (S.D.W. Va. Mar. 26, 2018), *aff'd sub nom. Belville v. Ford Motor Co.*, 919 F.3d 224 (4th Cir. 2019) ("Plaintiffs fail to address their burden of demonstrating manifestation of the alleged defect by offering evidence that . . . [the] events likely were caused by the alleged defect.").  Because C&S fails to meet the essential element of causation under any design defect theory, Wolverine is entitled to summary judgment on Count III of the SATPC in the GNY Action, ECF 34, and Count III of the SATPC in the Resident Insurers' Action, ECF 22, No. 20-2519.

### ii. The Council

C&S alleges that the Council's negligent failure to maintain an operable main water valve renders it a joint tortfeasor liable for a contributive share in the Resident Insurers' Action. ECF 22 ¶¶ 49-50, No. 20-2519. The Council argues that it is entitled to summary judgment because: (1) it cannot be a joint tortfeasor to torts committed against itself; (2) C&S proffers insufficient evidence of negligence on the Council's part; and (3) it owed no duty to C&S. The Council's second argument prevails.[3]

First, the Council argues that C&S's contribution claim fails because the Council is legally indistinguishable from Plaintiffs in both actions. ECF 67-1 at 10-11 ("[T]he [Council] does not owe any liability to its Insured, GNY. This is because GNY and its insured are one and the same for purposes of this subrogation claim . . . Similarly, the Council . . . is comprised of the Unit owners in the condominium, and any duties owes its until [*sic*] owners are solely based on the Maryland Condominium Act, the Bylaws and the Declarations."). The Council may be correct that C&S could not maintain a claim for contribution against it in the GNY Action—which is brought in the Council's shoes—but C&S has not attempted to do so. Rather, C&S only asserts a claim for contribution against the Council in the Resident Insurers' Action. *Compare* ECF 22, No. 20-2519 *with* ECF 34. As applied to the Resident Insurers' Action, the Council's argument is unpersuasive. The Council cites no authority for its apparent position that as a council comprised of all unit owners, it is legally indistinct from its members and therefore cannot be liable in negligence to any individual unit owner. Indeed, Maryland's highest court has expressly held the contrary. *See Greenstein v. Council of Unit Owners of Avalon Ct. Six Condo., Inc.*, 201 Md. App.

---

[3] In light of the conclusion that C&S's contribution claim fails for lack of evidence sufficient to meet each element of its negligence claim, this Court finds it unnecessary to consider the Council's final argument.

186, 208, 29 A.3d 604, 617 (2011) (recognizing the right of individual unit owners to initiate actions against their condominium for negligent failure to maintain common elements).

Next, the Council insists that even if it could be liable in the Resident Insurers' Action, C&S's claim fails for insufficient evidence of negligence. ECF 67-1 at 11. To prove negligence under Maryland law, C&S must establish: "(1) that [the Council] was under a duty to protect the plaintiff from injury, (2) that [the Council] breached that duty, (3) that the plaintiff suffered actual injury or loss, and (4) that the loss or injury proximately resulted from the [Council's] breach of the duty." *Macias v. Summit Mgmt., Inc.*, 243 Md. App. 294, 316, 220 A.3d 363, 375 (2019) (citing *Joseph v. Bozzuto Mgmt., Co.*, 173 Md. App. 305, 314, 918 A.2d 1230 (2007)). The Council does not deny that its bylaws, declarations, and the Maryland Condominium Act create a variety of legal duties owed to its unit owners, including to maintain common elements of the Warrington such as its plumbing systems in safe and operable working conditions.[4] ECF 67-1 at 11, 14; *see also* Md. Code Ann., Real Prop. § 11-108.1; Md. Code Ann., Real Prop. § 11-131. Nor does the Council contest that owners of the Affected Condos suffered actual injury or loss. Rather, the Council insists that C&S has not adduced sufficient evidence as to the second and fourth elements of its claim. With regards to causation, this Court agrees.

Assuming without deciding that the Council's failure to maintain an operable main water valve could constitute a breach of its duties to its unit owners, C&S's claim still fails to demonstrate a causal relationship between the alleged breach and the damages to the Affected Condos. C&S provide no support for its conclusory assertion that "consequential damages to the building were significantly greater than if the valve worked and the water supply could have been shut off when

---

[4] Under Maryland law, condominium unit owners "occupy the legal status of invitee when they are in the common areas of the complex over which the condominium association maintains control." *See Macias*, 243 Md. App. at 327-28.

13

Mr. Minor first attempted to shut off the valve." ECF 70-1 at 3; *see also id.* at 7 ("The causation is that had the valve been operable, and had been shut off by Mr. Minor, there would not have been damage to the lower floors of the property."). This Court discerns no evidentiary basis for C&S's apparent assumption that damages to the Affected Condos were increased by Minor's inability to turn the wheel on the main water valve. Minor averred that when he initially arrived on the 12th floor, it was already experiencing flood-like conditions. *See* ECF 70-2 at 21 (Ex. 2, Minor Dep) (describing his movements on the 12th floor "like traveling through a waterfall."). Minor subsequently left to greet personnel from the Baltimore City Fire Department and returned to the 12th floor to renew his efforts to reach that floor's water valve, before finally traveling to the lower level of the Warrington where the main water valve was located. It is entirely plausible that the Affected Condos incurred more damages during the period of time when Minor struggled unsuccessfully to turn the wheel on the main water valve. Alternatively, it is similarly likely that—given the amount of water flooding through the Warrington, and Minor's circuitous journey to the main water valve—the marginal additional delay caused by his inability to turn the wheel had no measurable impact on the Affected Condos' damages. C&S offers no admissible evidence as to the former theory[5] which would permit a reasonable jury to find in its favor. Having failed to do

---

[5] Although C&S did not direct it to this Court's attention, Dr. Bramel opines in his appended report that "[b]ased on the deposition testimony of Mr. Roberson, it took a significant time to shut off the water after the leak was noted . . . it significantly increased the time duration of the leak, quantity of water, and damage to the property and is the responsibility of the condominium association." ECF 66-8 at 6 (Dr. Bramel App. Rep.). Dr. Bramel defended this assertion in his deposition but conceded that it was based merely on "common sense." *See* ECF 68-2 at 118-122. Similarly, C&S did not provide the Court relevant excerpts of Mr. Roberson's deposition testimony, from which Dr. Bramel apparently concluded that the leak continued for "a significant time." As the non-moving party, it is C&S's burden—not this Court's—to proffer specific facts in evidence to demonstrate that a genuine issue exists for trial. *See Casey*, 823 F. Supp. 2d at 348. C&S's failure to raise Dr. Bramel's opinion is immaterial, however, in light of its unsupported and speculative nature. This Court is unaware of any credentials or experience that would permit Dr. Bramel to testify as an expert on water damages, nor were his conclusions based on reliable methodologies

so, C&S cannot meet its burden on summary judgment.[6] The Council is accordingly entitled to summary judgment on Count V.

## B. Indemnification

C&S also asserts indemnification claims against Wolverine in both actions (Count IV, ECF 22, No. 20-2519; Count IV, ECF 34) and against the Council in the Resident Insurers' Action (Count VI, ECF 22, No. 20-2519). Whether premised on tort or contract, C&S's claims for indemnification fail as a matter of law. Summary judgment will accordingly be granted in favor of Wolverine and the Council on the respective indemnification claims against them.

Wolverine and the Council are entitled to summary judgment insofar as C&S's indemnification claims are based in tort because, as described above, C&S fails to create a genuine dispute as to the liability of either Third-Party Defendant. *See Pac. Indem. Co. v. Whaley*, 560 F. Supp. 2d 425, 431 (D. Md. 2008) ("A right to indemnity may arise in tort 'where the character of one tortfeasor's conduct is significantly different from that of another who *is also liable for the same damages*.'" (emphasis supplied) (quoting *Kelly v. Fullwood Foods, Inc.*, 111 F. Supp. 2d 712, 714 (D. Md. 2000)). Moreover, even if C&S had survived summary judgment on its contribution claims, it would still be precluded from tort indemnity. As this Court previously explained in a related context, "C&S cannot seek tort indemnity in this case, as Maryland law is clear that 'one who is guilty of active negligence cannot obtain tort indemnification.' . . . C&S will

---

or principles. ECF 68-2 at 118-122 (admitting that he had not inspected, tested, or calculated the size, pressure, or temporal duration of the leak).

[6] C&S's references to *Mercy Med. Ctr. v. Julian*, 429 Md. 348, 354 (2012) (defining contribution), and *Richards v. Freeman*, 179 F. Supp. 2d 556, 560 (2002) (affirming the viability of a contribution claim against a subsequent tortfeasor) are inapposite. Both cases stand for settled principles of law, which this Court does not contest, and neither excuses C&S's burden to show some causal relationship between the Council's alleged negligence and the damages to the Affected Condos.

only be liable in this case if it is determined to have been negligent, and if it is determined to be negligent then it cannot recover from the Third-Party Defendants." ECF 54 at 6.

This Court's earlier determinations also foreclose C&S's claims for contractual indemnification against the Council. In granting Jennings's motions to dismiss C&S's third-party claims against him, this Court rejected C&S's theory that it was a third-party beneficiary to the agreement between Jennings and the Council and was therefore entitled to indemnification under the contract. *Id.* In doing so, this Court explained that under Maryland law, "C&S would at best be an incidental beneficiary, if it can be viewed as a beneficiary to the letter agreement at all . . . there is no suggestion that the protection of Miller's subcontractors was contemplated in any way, and it certainly does not 'clearly appear that the parties intended to recognize' C&S as 'the primary party in interest.'" *Id.* at 7-8. This Court's previous conclusion that the agreement does not create a right of indemnification in favor of C&S applies with equal force here. The Council is accordingly entitled to summary judgment as to C&S's claim for indemnification in Count VI of the Resident Insurers' Action.

Finally, C&S offers no evidence of any agreement to support its claim for contractual indemnification from Wolverine. *See* ECF 34 ¶ 36 ("Wolverine is liable for the entire amount of damages recovered against either C&S and Wolverine because Wolverine expressly and/or impliedly contracted that it would hold harmless and indemnify C&S for losses which Wolverine caused and/or contributed to."). Perhaps recognizing the flaw in its legal theory, C&S does not even address its claim for contractual indemnification in opposition to Wolverine's Motion for

Summary Judgment.[7]  Wolverine is therefore entitled to summary judgment on C&S's indemnification claims in both actions.  ECF 22 (Count IV), No. 20-2519; ECF 34 (Count IV).

## IV. CONCLUSION

For the reasons set forth above, Wolverine's, ECF 66, and the Council's, ECF 67, respective Motions for Summary Judgment are granted.  A separate Order follows.

Dated:  March 30, 2022

/s/
Stephanie A. Gallagher
United States District Judge

---

[7] Indeed, neither Wolverine's briefing in support of its Motion for Summary Judgment, ECF 66-1, nor C&S's briefing in opposition, ECF 68-1, draw any distinction between C&S's claims for contribution and indemnification.  The parties' briefings are instead dedicated solely to the question of Wolverine's liability in tort for design defect.